**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Elkins**


**LOIS ALT**, d/b/a Eight is Enough,

     Plaintiff,

**AMERICAN FARM BUREAU** and
**WEST VIRGINIA FARM BUREAU**,

     Plaintiff Intervenors,

   v.          **Civil Action No. 2:12-CV-42**
                Judge Bailey
**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY**,

     Defendant,

**POTOMAC RIVERKEEPER**, **WEST
VIRGINIA RIVERS COALITION**,
**WATERKEEPER ALLIANCE**, **CENTER
FOR FOOD SAFETY**, and **FOOD &
WATER WATCH**,

     Defendant Intervenors.


**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF AND PLAINTIFF-INTERVENORS'
JOINT MOTION FOR SUMMARY JUDGMENT**

   Pending before this Court are: (1) Plaintiff and Plaintiff Intervenors' Joint Motion for

Summary Judgment [Doc. 92]; (2) The United States' Cross-Motion for Summary Judgment

[Doc. 105]; and (3) Environmental Intervenors' Motion for Summary Judgment [Doc. 108].

All the above Motions have been fully briefed and are ripe for decision.

   In addition, the Plaintiff and Plaintiff-Intervenors have filed a Motion for Leave to File

1

Joint Surreply in Response to the U.S. Environmental Protection Agency's Reply in Support of Summary Judgment [Doc. 138] and the EPA has included a request for leave to file a surrebuttal in its United States' Opposition to Plaintiff's Motion for Leave of Court to File Surreply [Doc. 140].

## Procedural Background

This civil action was filed by the plaintiff, Lois Alt, on June 14, 2012, seeking declaratory and other relief due to the issuance by the United States Environmental Protection Agency ("EPA"), of a November 14, 2011, "Findings of Violation and Order for Compliance" under the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq* [Doc. 1]. By Order entered October 9, 2012, this Court permitted the American Farm Bureau and West Virginia Farm Bureau (collectively "Farm Bureaus" or "Plaintiff Intervenors") to intervene in the action [Doc. 27].

On March 12, 2013, the EPA moved to dismiss this case as moot [Doc. 68]. By Order entered April 22, 2013, this Court denied the EPA's Motion to Dismiss, permitted the Potomac Riverkeeper, West Virginia Rivers Coalition, Waterkeeper Alliance, Center for Food Safety, and Food & Water Watch (collectively "Environmental Intervenors" or "Defendant Intervenors") to intervene, and established a briefing schedule on the merits [Doc. 88].

On July 1, 2013, the plaintiff and Farm Bureaus filed their Plaintiff and Plaintiff Intervenors' Joint Motion for Summary Judgment and Supporting Memorandum [Doc. 92]. On August 1, 2013, the EPA filed its United States' Cross-Motion for Summary Judgment [Doc. 105] and the United States' Memorandum in Support of its Cross-Motion for Summary Judgment and in Opposition to Plaintiff's and Plaintiff-Intervenors' Motion For

Summary Judgment [Doc. 106]. On the same date, the Environmental Intervenors filed their Environmental Intervenors' Motion for Summary Judgment [Doc. 108] and Memorandum Supporting Environmental Intervenors' Motion for Summary Judgment and in Opposition to Plaintiff's and Plaintiff Intervenors' Motion for Summary Judgment [Doc. 108-1]. On August 2, 2013, the Environmental Intervenors filed an Affidavit in support of their arguments [Doc. 109]. On September 4, 2013, the plaintiff and Plaintiff-Intervenors filed Plaintiff and Plaintiff-Intervenors' Joint Combined Response and Reply to Defendants' Motions for Summary Judgment [Doc. 121]. On October 3, 2013, the Environmental Intervenors filed their Reply in Further Support of Environmental Intervenors' Motion for Summary Judgment [Doc. 136]. On October 4, 2013, the EPA filed United States' Reply Memorandum In Support of its Cross-Motion for Summary Judgment [Doc. 137].

During this briefing period, the Chesapeake Bay Foundation, Inc. ("Chesapeake"), filed a motion for leave to intervene [Doc. 94], which, after briefing, was denied by Order entered July 30, 2013 [Doc. 104]. On August 1, 2013, Chesapeake filed its Motion of Chesapeake Bay Foundation, Inc. for Leave to File an *Amicus Curiae* Brief in Support of Defendant [Doc. 107]. On August 29, 2013, Chesapeake filed a Motion of Proposed *Amicus Curiae,* Chesapeake Bay Foundation, Inc., for Leave to Submit Extra-record Materials [Doc. 118], seeking leave to file 499 pages of documents not contained in the Administrative Record. By Order entered September 9, 2013, this Court denied Chesapeake's motion to file a brief as *amicus curiae* and motion to file extra record materials [Doc. 124].

**Factual Background**

Lois Alt operates a concentrated animal feeding operation ("CAFO") at Old Fields, Hardy County, West Virginia, for raising poultry [AR1; AR2 at 3].[1] The facility consists of eight poultry confinement houses equipped with ventilation fans, a litter storage shed, a compost shed and feed storage bins [AR2 at 4]. All poultry growing operations, manure and litter storage, and raw material storage at Lois Alt's CAFO are under roof [AR2 at 4-5].

Some particles of manure and litter from Ms. Alt's confinement houses have been tracked or spilled in Ms. Alt's farmyard [AR1 at 4; AR2 at 4-5]. Some dust composed of manure, litter and dander, and some feathers, have been blown by the ventilation fans from the confinement houses into Ms. Alt's farmyard where they have settled on the ground [AR1 at 3; AR2 at 4].

Precipitation has fallen on Ms. Alt's farmyard, where it contacted the particles, dust and feathers from the confinement houses, creating runoff that carried such particles, dust and feathers across a neighboring grassy pasture and into Mudlick Run, a water of the United States [AR1 at 3-4; AR2 at 4-5; AR3].

Ms. Alt does not have a permit pursuant to the CWA or corresponding law of the State of West Virginia authorizing discharges into Mudlick Run [AR1 at 4; AR2 at 3].

At her CAFO, Ms. Alt implements management practices and procedures to reduce the amount of manure and litter that will be exposed to precipitation in her farmyard [*See* AR2 3-5; Doc. 76-2 at 5-6 (NMP); Doc. 76-1 at 5-7 (EPA June 22, 2012, Inspection Report)]. These include:

---

[1] Citation is to the Administrative Record in this case.

1.      Raising of poultry in confined poultry houses;

2.      Storage of manure and litter in a covered shed;

3.      Composting of mortalities in a covered shed;

4.      Storage of feed in covered bins;

5.      Exercise of reasonable care in cleaning up manure or litter that might spill during transfer operations, such as loading trucks to haul away the litter or moving litter from the confinement houses to the storage shed, including: (a)  scraping and sweeping loading areas at the confinement houses and storage sheds during and after litter transfer; and (b) conducting litter transfer and loading operations during dry weather; and

6.      Cleaning of ventilation fans and shutters in a manner that prevents the dust collected on them from being deposited in the farmyard.

EPA asserted its regulatory authority over stormwater runoff from Lois Alt's farmyard by issuing its November 14, 2011, Findings of Violation and Order for Compliance, executed by the Director of Water from EPA Region 3 (hereinafter, the "Order") [AR1].   In its Order, EPA found that Ms. Alt's poultry production facility is a "concentrated animal feeding operation" (CAFO) that "has discharged pollutants from man-made ditches via sheet flow to Mudlick Run during rain events generating runoff without having obtained an NPDES permit." [AR1, ¶¶ 30, 32].   On that basis, EPA concluded as a matter of law that Ms. Alt is in violation of the CWA and EPA's implementing regulations. [AR1 ¶ 33].   EPA said that it could bring a civil action against Ms. Alt for this violation, in which case Ms. Alt "will be subject to civil penalties of up to $37,500 per day of violation . . .." [AR1 ¶ 38].   EPA added that a criminal action could be initiated, and that if Ms. Alt were to be convicted she

"may be subject to a monetary fine and/or imprisonment . . .." [AR1 ¶¶ 38, 39]. EPA also ordered Ms. Alt to apply for a permit [AR1 ¶ 34].

Plaintiff and Plaintiff-Intervenors move for summary judgment that EPA lacks the authority to issue its Order finding that Ms. Alt violated the CWA when precipitation on her farmyard picked up dust and poultry manure emitted from her poultry house ventilation fans and/or particles of poultry litter tracked or spilled from her poultry houses and caused a discharge to Mudlick Run.

## Jurisdiction

In this case, the plaintiffs and plaintiff-intervenors seek declaratory judgment that any precipitation related discharges containing manure and litter emanating from Ms. Alt's farmyard are exempt agricultural stormwater discharges.

The EPA argues that this Court lacks jurisdiction since the issue was addressed by the EPA in its 2003 CAFO Rule which was upheld by the Second Circuit in *Waterkeeper Alliance, Inc. v. USEPA*, 399 F.3d 486 (2nd Cir. 2005).

As part of its argument, EPA contends that the agricultural stormwater exemption applies **only** to discharges from land application areas under the control of the CAFO. As will be discussed below, this Court is unable to accept this premise. The plaintiff and plaintiff-intervenors are not challenging the 2003 Rules, which pertain to discharges from land application areas. Accordingly, this action is not barred by *Waterkeeper* or 33 U.S.C. § 1369(b). The plaintiffs and plaintiff intervenors do not "seek 'an implicit declaration that the . . . regulations were invalid as written.'" *Decker v. Northwest Environmental Defense Center*, ___ U.S. ___, 133 S.Ct. 1326, 1335 (2013), quoting *Environmental*

***Defense v. Duke Energy Corp.***, 549 U.S. 561, 573 (2007). "And, as a result, § 1369(b) is not a jurisdictional bar to this suit." ***Id.***

<u>Legal Standard</u>

This Court's review of the Order is governed by the deferential standard set forth in the Administrative Procedure Act, 5 U.S.C. § 706, under which agency action is valid unless, *inter alia*, it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A). This standard "is a narrow one," under which the Court is not "to substitute its judgment for that of the agency." ***Citizens to Preserve Overton Park, Inc. v. Volpe***, 401 U.S. 402, 416 (1971). Judicial review of the Order must be based on the administrative record that was compiled by the Agency. ***Camp v. Pitts***, 411 U.S. 138, 142 (1973).

<u>Statutory and Regulatory History</u>

The central issue presented by the case is whether the litter found on Ms. Alt's farmyard that could be picked up by rainwater, washed two hundred yards across a grassy cow pasture, and discharged into a creek named Mudlick Run is exempted from liability under the agricultural stormwater exception to the definition of a point source. This issue necessitates a review of the statutory and regulatory history of the Clean Water Act.

"In 1948, Congress enacted the Federal Water Pollution Control Act (FWPCA). FWPCA encouraged states to enact uniform laws to combat water pollution, recognizing 'that water pollution control was primarily the responsibility of state and local governments.' The state-run regulation of discharges 'involved a complex process in which the government was required to trace in-stream pollution back to specific discharges, and,

given the difficulty of this task, enforcement was largely nonexistent.' The federal government's power to curtail water pollution was also limited under FWPCA. Thus, federal action against a discharger could only proceed 'with the approval of state officials in the state where the discharge originated and after a complicated series of notices, warnings, hearings, and conference recommendations.'" *National Pork Producers Council v. USEPA*, 635 F.3d 738, 742 (5th Cir. 2011)(internal footnotes omitted).

"In 1972, FWPCA was amended to replace the state-run regulation of discharges with an obligation to obtain and comply with a federally-mandated National Pollutant Discharge Elimination System (NPDES) permit program. These amendments also transformed FWPCA into what is known today as the CWA." *Id*. at 742-43. The Clean Water Act "was a dramatic response to accelerating environmental degradation of rivers, lakes and streams in this country. The Act's stated goal is to eliminate the discharge of pollutants into the Nation's waters by 1985. This goal [was] to be achieved through the enforcement of the strict timetables and technology-based effluent limitations established by the Act." *Natural Resources Def. Council v. Costle*, 568 F.2d 1369, 1371 (D.C. Cir. 1977).

"The NPDES permit program, which is primarily articulated in 33 U.S.C. § 1342, allows the EPA to 'issue a permit for the discharge of any pollutant, or combination of pollutants. . ..' 33 U.S.C. § 1342(a)(1). To be clear, the CWA prohibits the discharge of pollutants into navigable waters. 33 U.S.C. § 1311. However, if a facility requests a permit, it can discharge within certain parameters called effluent limitations and will be deemed a point source. 33 U.S.C. §§ 1342, 1362(14). Accordingly, the point source will be regulated

pursuant to the NPDES permit issued by the EPA or one of 46 States authorized to issue permits." **Pork Producers**, *supra* at 743.

The term "point source" was originally defined in § 1362(14) as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." **Costle**, at 1373.

In 1973, the EPA Administrator issued regulations that exempted certain categories of "point sources" from the permit requirements of the CWA. "The 1973 regulations exempted discharges from a number of classes of point sources from the permit requirements of § 402 [§ 1362], including all silvicultural point sources; all confined animal feeding operations below a certain size; all irrigation return flows from areas of less than 3,000 contiguous acres or 3,000 noncontiguous acres that use the same drainage system; all nonfeedlot, nonirrigation agricultural point sources; and separate storm sewers containing only storm runoff uncontaminated by any industrial or commercial activity. The EPA's rationale for these exemptions [was] that in order to conserve the Agency's enforcement resources for more significant point sources of pollution, it [was] necessary to exclude these smaller sources of pollutant discharges from the permit program." **Id**. at 1372-73.

The permissibility of these regulations was challenged in **Natural Resources Def. Council v. Train**, 396 F.Supp. 1393 (D.D.C. 1975), in which the Court found that the EPA Administrator lacked the authority to exempt point source discharging pollutants from

regulation. This decision was appealed to the United States Court of Appeals for the District of Columbia Circuit, which, in **Natural Resources Def. Council v. Costle**, 568 F.2d 1369 (D.C. Cir. 1977), affirmed the decision, thereby voiding the regulations.

In 1987, Congress amended § 1362(14) to add an exemption to the statutory definition of a point source. As amended, § 1362(14) defined "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. **This term does not include agricultural stormwater discharges** and return flows from irrigated agriculture." (emphasis added). Nowhere did Congress define the term "agricultural stormwater" nor did the EPA promulgate any regulations defining the term.

For a number of years, this section was interpreted in accordance with its plain meaning. For example, in **Concerned Area Residens for the Environment v. Southview Farm**, 34 F.3d 114 (2nd Cir. 1994), the Second Circuit found that liquid manure spreading operations of a large dairy farm were a point source discharge. The Court stated that the real issue was whether the discharges were the result of precipitation.

Similarly, in **Fishermen Against the Destruction of the Environment v. Closter Farms, Inc.**, 300 F.3d 1294 (11th Cir. 2002), the Eleventh Circuit found that waters pumped into Lake Okeechobee by Closter Farms was agricultural stormwater. The Court stated:

> The CWA specifically exempts "agricultural stormwater discharges and return

flows from irrigation agriculture" from the definition of a point source. *See* 33 U.S.C. § 1362(14). Because these water discharges are not considered to be point sources, there is no requirement that a property owner discharging these waters have an NPDES permit. *See* 33 U.S.C. §§ 1311, 1342.

300 F.3d at 1297.

The Court added:

Evidence established that the sources of the water being pumped into Lake Okeechobee are: (1) rainfall, (2) groundwater withdrawn into the canals from the areas being drained, and (3) seepage from the lake. The determination that the discharged rainwater is "agricultural stormwater discharge" is a reasonable one. *See **Concerned Area Residents for the Env't v. Southview Farm**,* 34 F.3d 114, 121 (2d Cir. 1994) (holding that "agricultural stormwater discharge" exemption applies to any "discharges [that] were the result of precipitation"). The fact that the stormwater is pumped into Lake Okeechobee rather than flowing naturally into the lake does not remove it from the exemption. Nothing in the language of the statute indicates that stormwater can only be discharged where it naturally would flow. *See* 33 U.S.C. § 1362(14). There also does not appear to be any case law supporting FADE's position.

*Id*.

"[A]fter being sued for failing to revise the effluent limitations for CAFO operations, the EPA revised its regulations 'to address not only inadequate compliance with existing

policy, but also the "changes that have occurred in the animal production industries.'"

*Waterkeeper* [*Alliance, Inc. v. USEPA*], 399 F.3d 486, 494 [2nd Cir. 2005], (citing 66 Fed.Reg. 2960, 2972 (Jan. 12, 2001). Subsequently, in the 2003 Rule, the EPA shifted from a regulatory framework that explained what type of CAFO *must have* a permit to a broader regulatory framework that explained what type of CAFO *must apply* for a permit." *Nat'l Pork Producers Council v. USEPA*, 635 F.3d 738, 744 (5th Cir. 2011).

"Under the 2003 Rule, all CAFOs were required to apply for an NPDES permit whether or not they discharged. 68 Fed.Reg. 7176, 7266 (Feb. 12, 2003). Specifically, every CAFO was assumed to have a 'potential to discharge' and had to apply for an NPDES permit. *Id.* at 7266-67. However, an option built into the Rule permitted a CAFO to request from the EPA a 'no potential to discharge' determination. *Id.* If the CAFO proved that it did not have the potential to discharge, the CAFO was not required to seek a permit. *Id.* The 2003 Rule also **expanded** the definition of exempt 'agricultural stormwater discharge' to include land application discharge, if the land application comported with appropriate site-specific nutrient management practices. *Id.* at 7198. However, if the land application was not in compliance with those practices, the land application discharge would be an unpermitted discharge in violation of the CWA. *Id.* at 7197." *Pork Producers*, 635 F.3d at 744 (emphasis added).

In *Waterkeeper*, the "Farm Petitioners asked the Second Circuit to vacate the 2003 Rule's 'duty to apply' because it was outside of the EPA's authority. The court agreed and held that the EPA cannot require CAFOs to apply for a permit based on a 'potential to discharge.' *Id.* at 504-06. The Second Circuit explained that the plain language of the

CWA 'gives the EPA jurisdiction to regulate and control only actual discharges - not potential discharges, and certainly not point sources themselves.' *Id*. at 505. In sum, the Second Circuit held that the CWA 'on its face, prevents the EPA from imposing, upon CAFOs, the obligation to seek an NPDES permit or otherwise demonstrate that they have no potential to discharge.' *Id*. at 506." ***Pork Producers***, 635 F.3d at 744-745.

"The Environmental Petitioners took issue with the 2003 Rule's exclusion of agricultural stormwater discharge, resulting from land application, from the definition of 'point source discharge.' They argued that the CWA requires that *all* discharges from a CAFO are point source discharges, 'notwithstanding the fact that agricultural stormwater discharges are otherwise deemed exempt from regulation.' [***Waterkeeper***] at 507. The Second Circuit disagreed. The court explained that the CWA is 'ambiguous as to whether CAFO discharges can ever constitute agricultural stormwater.' *Id*. Thus, the court examined whether the exemption for certain land application discharges was grounded in a permissible construction of the CWA. *Id*. The Second Circuit determined that congressional intent and its precedent supported the EPA's exclusion of agricultural stormwater discharge, resulting from land application, from designation as a point source. *Id*. at 507-09." ***Pork Producers***, at 745.

In response to the ***Waterkeeper*** decision, the EPA published a notice of proposed rulemaking. Instead of the 2003 Rule's requirement of a duty to apply for a permit, the new rule required a CAFO owner or operator to apply for a permit only if the CAFO discharged or proposed to discharge pollutants. On November 20, 2008, the EPA published the 2008 Rule, upon which judicial review was sought. ***Pork Producers***, at 746.

"Shortly after the EPA issued the 2008 Rule, it issued three guidance letters, a common practice following the issuance of complex regulations. *See generally* ***Appalachian Power Co. v. Envtl. Prot. Agency***, 208 F.3d 1015, 1020 (D.C. Cir. 2000). On January 16, 2009, Benjamin H. Grumbles, Assistant Administrator for the EPA's Office of Water, sent a letter to Senator Thomas R. Carper of Delaware; on the same day, Grumbles sent an identical letter to then-congressperson Michael N. Castle of Delaware; and on March 4, 2009, James D. Giattina, Director of the Water Protection Division for Region 4, sent a letter to Jeff Smith, an executive for Perdue Farms, Inc." ***Id.***, at 747-48.

"The guidance letters sent to the Delaware Congress members were in response to their joint letter to the EPA concerning 'the status of EPA's authorization of Delaware's [state-run CAFO] program.' Grumbles explained that Delaware's CAFO program was denied status because it did not comply with the CWA. Notably, the Delaware program requires a permit only if 'a CAFO meets the numerical animal limit, has a discharge into waters of the state, and is in non-compliance with Delaware Nutrient Management Regulations.' The guidance letters further explained the EPA's requirements for a state-run CAFO program and that these requirements were the national floor for these programs. They also stated that the CWA prohibits the discharge of all pollutants by a CAFO. Moreover, '[t]he term pollutant is defined very broadly in the CWA. . .. Potential sources of such pollutants at a CAFO could include . . . litter released through confinement house ventilation fans.' The guidance letters further explained that 'any point source discharge of stormwater that comes into contact with these materials and reaches waters of the United States is a violation of the CWA unless authorized by a [permit].'" ***Id.***, at 748.

"The letter sent by Giattina was in response to questions posed by Smith, regarding Smith's concern that certain EPA field offices were incorrectly interpreting the 2008 Rule. Relevant here, Smith asked whether operators of dry litter farms need to apply for a permit 'because of potential runoff from the production area[, and if] so, are there examples of dry poultry litter operations having a discharge?'  The letter explained that all CAFOs must have permits prior to discharging pollutants and that 'pollutant' is defined broadly by the CWA and the regulations could include litter released through confinement house ventilation fans.  The letter also discussed the agricultural stormwater exemption, explaining that it 'applies only to precipitation-related discharges from land application areas ... where application of manure, litter, or process wastewater is in accordance with appropriate nutrient management practices,' and not to 'discharges from the CAFO production area.'" *Id.*

These letters were found by the Fifth Circuit not to constitute final agency action, because the letters merely restated the prohibition against discharging pollutants without an NPDES permit, thereby failing to meet the second prong of ***Bennett v. Spear***, 520 U.S. 154 (1997).  The Fifth Circuit found that it lacked jurisdiction to consider the petitioners' challenge to the guidance letters.  ***Pork Producers***, 635 F.3d at 755-56.

### Discussion

It appears to be a central assumption of the EPA's position that the agricultural stormwater discharge exemption had no meaning whatsoever from the time the exemption was added to the statute in 1987 until the EPA promulgated its new regulations in 2003. This is an assumption that this Court simply cannot accept.

"It is a basic tenet that 'regulations, in order to be valid, must be consistent with the statute under which they are promulgated.'" ***Decker v. Northwest Environmental Defense Center***, ___ U.S. ___, 133 S.Ct. 1326, 1334 (2013), quoting ***United States v. Larionoff***, 431 U.S. 864, 873 (1977).

The term "agricultural stormwater discharge" was not and has not been defined in the statute. The fact that Congress found it unnecessary to define the term indicates that the term should be given its ordinary meaning.

The Act defines "discharge of a pollutant" to mean "any addition of any pollutant to navigable waters from any point source." § 1362(12). Thus, the basic prohibition in section 1311(a) and the requirement to obtain an NPDES permit pursuant to section 1342 apply only to discharges from a *point source*.

The Act defines "point source" as follows:

> The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, *concentrated animal feeding operation*, or vessel or other floating craft, from which pollutants are or may be discharged. This term *does not include agricultural stormwater discharges* and return flows from irrigated agriculture.

§ 1362(14) (emphasis added).

The term generally includes a CAFO, but specifically excludes "agricultural stormwater discharges," even if they are associated with a CAFO or any other type of point

source. Therefore, the discharge of pollutants from a CAFO requires an NPDES permit *unless* that discharge is an "agricultural stormwater discharge." Because neither the Act nor EPA's implementing regulations has defined "agricultural stormwater discharges" within the context of CAFO farmyard runoff, it falls to this Court to interpret this statutory term.

This Court must decide the issue based upon the statutory text. The terms "agricultural" and "stormwater" should be given their ordinary meaning in accordance with common usage. *BP v. Burton*, 549 U.S. 84, 91 (2006); *Perrin v. United States*, 444 U.S. 37, 42 (1979). As the Fourth Circuit has stated:

> We construe the statute in accordance with two principles of statutory construction: plain English and common sense. *See First United Methodist Church v. United States Gypsum Co.*, 882 F.2d 862, 869 (4th Cir. 1989) (stating that common sense is the "most fundamental guide to statutory construction"), *cert denied*, 493 U.S. 1070 (1990); *Sutton v. United States*, 819 F.2d 1289, 1292 (5th Cir. 1987) (stating that the courts have a duty to construe the language in a statute consistent with its plain meaning); *The King v. Inhabitants of St. Nicholas,* 4 Neville & Manning 422, 426-27 (Eng. K.B. 1835) (Denman, C.J.) ("[W]here I find the words of a statute perfectly clear I shall adhere to those words, and shall not allow myself to be diverted from them by any supposed consequences of one kind or the other . . .."), *cited in* **I Kent's**

*Commentaries,* 467-68, n. d (1836).

*Kofa v. U.S. INS*, 60 F.3d 1084, 1088-89 (4th Cir. 1995).

Common sense and plain English lead to the inescapable conclusion that Ms. Alt's poultry operation is "agricultural" in nature and that the precipitation-caused runoff from her farmyard is "stormwater."

In 2005, the Second Circuit took the same approach when it reviewed EPA's interpretation of the agricultural stormwater exemption in the context of CAFO land application areas. Examining the term "agricultural," that court said:

> Dictionaries from the period in which the agricultural stormwater exemption was adopted define "agriculture" or "agricultural" in a way that can permissibly be construed to encompass CAFOs. For example, Webster's New World Dictionary defined the term "agriculture" to include, *inter alia*, "work of cultivating the soil, producing crops, *and raising livestock*." WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH 26 (3rd College Ed. 1988). The Oxford English Dictionary similarly defined agriculture to include, *inter alia,* "cultivating the soil," "including the allied pursuits of gathering in the crops and *rearing live stock*." I THE OXFORD ENGLISH DICTIONARY 267 (2D Ed. 1989). Here, there is no question that CAFOs "rais[e]" or "rear" livestock . . ..

*Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486, 509 (2d Cir. 2005) (emphases added).

With respect to the term "stormwater," the court agreed with EPA that this should mean "precipitation-related discharge[s]." *Id*. at 508.

Contrary to EPA's present position, it is clear that the agricultural stormwater discharge exemption existed prior to the promulgation of the 2003 regulations.

In *Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114 (2d Cir. 1994), the Second Circuit considered an appeal in a citizen suit against a large dairy farm that had spread liquid manure over its fields. Manure had run off into surface waters, some while it was raining, and some while it was not. 34 F.3d at 117-18. As to the former, the court examined the meaning of the statutory exemption for agricultural stormwater, as revealed by the legislative history and context. *Id*. at 120. Because Congress had created the CWA's new stormwater permitting program at the same time (1987) that it enacted the agricultural stormwater exemption, the Court inferred that Congress intended that no permits would be required for agricultural stormwater under the new stormwater permit program. *Id*. The court then interpreted the statutory phrase "agricultural stormwater." *Id*. at 121. Giving the words their common-sense meaning, the court stated that discharges would be agricultural stormwater if they "were the result of precipitation." *Id*. In other words, a discharge of liquid manure would not be exempt just because it happened to be raining at the time, but a discharge of such manure *caused by* precipitation would be exempt. *Id*.

Similarly, in *Fishermen Against the Destruction of the Environment v. Closter Farms, Inc.*, 300 F.3d 1294 (11th Cir. 2002), the Eleventh Circuit found that waters pumped into Lake Okeechobee by Closter Farms was agricultural stormwater. The Court

stated:

> The CWA specifically exempts "agricultural stormwater discharges and return flows from irrigation agriculture" from the definition of a point source. *See* 33 U.S.C. § 1362(14). Because these water discharges are not considered to be point sources, there is no requirement that a property owner discharging these waters have an NPDES permit. *See* 33 U.S.C. §§ 1311, 1342.

300 F.3d at 1297.

In **Pork Producers**, the Fifth Circuit found that "[t]he 2003 Rule also **expanded** the definition of exempt "agricultural stormwater discharge" to include land application discharge, if the land application comported with appropriate site-specific nutrient management practices. 635 F.3d at 744.

It is clear, then, that the agricultural stormwater exemption existed prior to the 2003 regulations. Congress, however, has not seen fit to define the term. The EPA, however, has not promulgated any regulations defining the term other than the land application regulations, which was and is an expansion of the preexisting exemption. In fact, in the preamble to the 2003 Rule, the EPA stated that "*EPA does not intend its discussion* of how the scope of point source discharges from a CAFO is limited by the agricultural storm water exemption *to apply to discharges that do not occur as a result of land application* of manure, litter, or process wastewater by a CAFO to land areas under its control . . .." 68 Fed. Reg. at 7,198.

Given this situation, the EPA regulations are not entitled to deference under **Chevron, U.S.A. v. NRDC**, 467 U.S. 837 (1984) or **Auer v. Robbins**, 519 U.S. 452 (1997),

since the EPA has not promulgated any regulations covering the topic.  *See **Precon***

***Development Corp., Inc. v. U.S. Army Corps of Engineers***, 633 F.3d 278, 290 n. 10 (4th

Cir. 2011).  This Court will grant limited deference to the guidance letters only to the extent

that they have the power to persuade.  ***United States Dept. of Labor v. North Carolina***

***Growers Assoc., Inc.***, 377 F.3d 345, 353-54 (4th Cir. 2004), citing ***Skidmore v. Swift &***

***Co.,*** 323 U.S. 134 (1944); *see **Christensen v. Harris County**,* 529 U.S. 576, 587 (2000);

***United States v. Mead Corp.,*** 533 U.S. 218, 234 (2001).  In addition, the fact that the

EPA's present position concerning the exclusivity of the land application area regulations

represents a change of position from prior to 2003, militates against deference.  *See*

***Decker v. Northwest Environmental Defense Center***, ___ U.S. ___, 133 S.Ct. 1326,

1337-38 (2013), citing ***Christoper v. SmithKline Beecham Corp.***, ___ U.S. ___, 132 S.Ct.

2156, 2166-67 (2012).

Based upon a review of all of the above, this Court must conclude that there is more

to the agricultural stormwater exemption than as set forth in the 2003 land application area

regulations.

In addition to the position that the land application area regulations are the exclusive

source of the agricultural stormwater exemption and their plea for ***Chevron*** deference, the

defendants raise a number of arguments in opposition to the plaintiffs' position, including:

(1) that stormwater from a CAFO's production area is not entitled to the exemption; and (2)

that the Alt discharge is industrial rather than agricultural.

The plaintiffs have argued that the farmyard area of the Alt farm is not part of the

CAFO.  This Court agrees with the defendants and rejects this argument.  The areas of

grass and weeds between the poultry houses are part of the Alt poultry production facility. Plaintiffs' interpretation of the term "facility" to exclude the land adjacent to the confinement houses contravenes the plain language of the regulatory definition. "Facility" is defined to include any "point source," "including land or appurtenances thereto." 40 C.F.R. § 122.2. It thus includes any CAFO and the land appurtenant thereto - which includes the "farmyard."

This does not end the inquiry, however. EPA itself has stated that "[n]othing in the statutory language or legislative history indicates that Congress did not mean to include agricultural storm water discharges from a CAFO in this exclusion." EPA, *NPDES Permit Regulation and Effluent Limitation Guidelines [ELG] and Standards for CAFOs*, 68 Fed. Reg. 7,176, 7,197 (Feb. 12, 2003).

The EPA argues that the production area of a CAFO is ineligible for the agricultural storm water discharge exemption. This Court is not concerned with whether this assertion is valid, since the Alt "farmyard" is not a "production area."

The term "production area" is defined in 40 C.F.R. § 122.23(b)(8) as follows:

> (8) Production area means that part of an AFO that includes the animal confinement area, the manure storage area, the raw materials storage area, and the waste containment areas. The animal confinement area includes but is not limited to open lots, housed lots, feedlots, confinement houses, stall barns, free stall barns, milkrooms, milking centers, cowyards, barnyards, medication pens, walkers, animal walkways, and stables. . ..

The areas between the poultry houses are clearly not "the animal confinement area, the manure storage area, the raw materials storage area, and the waste containment areas." While the term "animal confinement area" is further defined in the regulation, each of the described areas are areas where animals may be kept or raised. What is described as a farmyard is not an area where animals are confined and therefore not a production area.

At one point, EPA agreed:

EPA disagrees the definition of production area explicitly includes the entire farmyard. EPA's definition does make it clear the animal confinement area, the manure storage area, the raw materials storage area, and the waste containment areas will continue to be address[ed] by today's revised rules. In the final rule EPA has included a clear definition as to the specific aspects of an operation that are considered within the production area. EPA believes it is important to regulate runoff from production areas since runoff from these areas is a major route of pollutant discharges from CAFOs. Therefore, in today's final rule, production area means that part of an AFO that includes the animal confinement area, the manure storage area, the raw materials storage area, and the waste containment areas.

EPA, *2003 Response to Comments* (EPA-HQ-OW-2002-0025-0060), at 1-661 (Excerpt CAFONODA-600031-1) (May 25, 2005).

This explanation makes plain EPA's longstanding interpretation that the agricultural stormwater exemption is inapplicable to runoff from *within* a confinement area, manure storage area, and similar features deemed to be the CAFO "production area." It is pointed

23

out that it is for this reason that Lois Alt and thousands of farmers like her not only keep their animals under roof, but also maintain covered structures for manure storage, composting, and similar activities.

The EPA argues that the litter and manure that may be in the farmyard would have originally come from the production area, rendering it ineligible for the stormwater exemption. This Court cannot accept this contention. In *Waterkeeper*, the court said that the Act should be read "as generally authorizing the regulation of CAFO discharges, but exempting such discharges from regulation to the extent that they constitute agricultural stormwater." 399 F.3d at 507. The court added that agricultural stormwater discharges are exempt from regulation **"even when those discharges came from what would otherwise be point sources."** *Id.* (emphasis added). The manure and litter in the farmyard would remain in place and not become discharges of a pollutant unless and until stormwater conveyed the particles to navigable waters.

Next, the defendants argue that in order to take advantage of the agricultural stormwater discharge exemption, the discharge must have an agricultural purpose. The only requirement is that the exempt discharges must be agriculture related. It is clear that the incidental manure and litter are related to the raising of the poultry and are therefore related to agriculture.

In *Waterkeeper*, the Second Circuit recognized that with the agricultural stormwater exemption "Congress was affirming the impropriety of imposing . . . liability for agriculture-related discharges triggered not by negligence or malfeasance, but by the weather-even when those discharges came from what would otherwise be point sources." 399 F.3d at 507.

24

The defendants next argue that the discharges from the Alt farmyard are industrial rather than agricultural. This Court cannot accept this argument. First, the Compliance Order issued to Ms. Alt makes absolutely no mention of industrial stormwater. Second, this position was rejected by the Second Circuit in **Waterkeeper**, 339 F.3d at 509 ("The Environmental Petitioners contend that CAFOs must be viewed as industrial, not agricultural. We disagree."). Third, the sole question presented here is whether stormwater discharges from Ms. Alt's farmyard are exempt "agricultural stormwater discharges;" and if they are, it is undisputed that they are exempt from *any* NPDES permit requirements, including industrial stormwater permit requirements. Indeed, because Congress created the stormwater permitting program at the same time it enacted the agricultural stormwater exemption, the **Southview Farm** Court concluded that a primary impetus behind the exemption was the desire to explicitly exclude agricultural operations from regulation under the stormwater program. 34 F.3d at 120 ("[W]e can infer that Congress wanted to make clear that agriculture was not included in this new program.").

## Conclusion

Based upon the foregoing, Plaintiff and Plaintiff Intervenors' Joint Motion for Summary Judgment [**Doc. 92**] is **GRANTED**. This Court declares that the litter and manure which is washed from the Alt farmyard to navigable waters by a precipitation event is an agricultural stormwater discharge and therefore not a point source discharge, thereby rendering it exempt from the NPDES permit requirement of the Clean Water Act.

The United States' Cross-Motion for Summary Judgment [**Doc. 105**]; and Environmental Intervenors' Motion for Summary Judgment [**Doc. 108**] are **DENIED**.

In addition, Plaintiff and Plaintiff-Intervenors' Motion for Leave to File Joint Surreply

in Response to the U.S. Environmental Protection Agency's Reply in Support of Summary Judgment [**Doc. 138**] and the EPA's request for leave to file a surrebuttal in its United States' Opposition to Plaintiff's Motion for Leave of Court to File Surreply [**Doc. 140**] are **DENIED**.

As a final matter, this matter is hereby **ORDERED STRICKEN** from the active docket of this Court, and the Clerk is **DIRECTED** to enter a separate judgment in favor of the plaintiff.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record herein.

**DATED:** October 23, 2013.

JOHN PRESTON BAILEY
CHIEF UNITED STATES DISTRICT JUDGE